OPINION
KING, Circuit Judge:
In June 2006, Albert Snyder instituted this diversity action in the District of Maryland against Westboro Baptist Church, Incorporated (the “Church”), and several of its members (collectively, the “Defendants”). Snyder’s lawsuit is predicated on two related events: a protest the Defendants conducted in Maryland near the fa *211 neral of Snyder’s son Matthew (an enlisted Marine who tragically died in Iraq in March 2006), and a self-styled written “epic” (the “Epic”) that the Defendants posted on the Internet several weeks after Matthew’s funeral. Snyder’s complaint alleged five state law tort claims, three of which are implicated in this appeal: invasion of privacy by intrusion upon seclusion, intentional infliction of emotional distress (“IIED”), and civil conspiracy. After a trial in October 2007, the jury found the Defendants liable for $2.9 million in compensatory damages and a total of $8 million in punitive damages. Although the district court remitted the aggregate punitive award to $2.1 million, it otherwise denied the post-trial motions. See Snyder v. Phelps, 533 F.Supp.2d 567 (D.Md.2008) (the “Post-Trial Opinion”). The Defendants have appealed, contending that the judgment contravenes the First Amendment of the Constitution. As explained below, we reverse on that basis.
I.
A.
The facts of this case as presented at trial are largely undisputed, and they are detailed in the district court’s Posh-Trial Opinion:
On March 3, 2006, Marine Lance Corporal Matthew A. Snyder was killed in Iraq in the line of duty. Shortly thereafter, two United States Marines came to the home of the Plaintiff, Albert Snyder, and told him that his son had died. As Matthew Snyder had lived in Westminster, Maryland, and graduated from Westminster High School, St. John’s Catholic Church in Westminster was selected as the site for his funeral, which was scheduled for March 10, 2006. Obituary notices were placed in local newspapers providing notice of the time and location of the funeral.
Defendant Fred W. Phelps, Sr., founded Defendant Westboro Baptist Church, Inc. in Topeka, Kansas, in 1955. For fifty-two years, he has been the only pastor of the church, which has approximately sixty or seventy members, fifty of whom are his children, grandchildren, or in-laws. Among these family members are Defendants Shirley L. Phelps-Roper and Rebekah A. Phelps-Davis. There are approximately ten to twenty members of the church who are not related to Phelps by blood or marriage. According to the testimony of Defendants’ expert, the members of this church practice a “fire and brimstone” fundamentalist religious faith. Among their religious beliefs is that God hates homosexuality and hates and punishes America for its tolerance of homosexuality, particularly in the United States military. Members of the church have increasingly picketed funerals to assert these beliefs. Defendants have also established a website identified as www. godhatesfags.com in order to publicize their religious viewpoint.
Defendants’ testimony at trial established that their picketing efforts gained increased attention when they began to picket funerals of soldiers killed in recent years. Members of the Phelps family prepare signs at an on-site sign shop at their Kansas church to take with them in their travels. They also utilize an on-site production facility to produce videos displayed on the church’s website.
Phelps testified that members of the Westboro Baptist Church learned of Lance Cpl. Snyder’s funeral and issued a news release on March 8, 2006, announcing that members of the Phelps family intended to come to Westminster, Maryland, and picket the funeral. On March 10, 2006, Phelps, his daughters Phelps-Roper and Phelps-Davis, and four of his grandchildren arrived in *212 Westminster, Maryland, to picket Matthew Snyder’s funeral. None of the Defendants ever met any members of the Snyder family.
Defendants’ rationale was quite simple. They traveled to Matthew Snyder’s funeral in order to publicize their message of God’s hatred of America for its tolerance of homosexuality. In Plaintiffs eyes, Defendants turned the funeral for his son into a “media circus for their benefit.” By notifying police officials in advance, Defendants recognized that there would be a reaction in the community. They carried signs which expressed general messages such as “God Hates the USA,” “America is doomed,” “Pope in hell,” and “Fag troops.” The signs also carried more specific messages, to wit: “You’re going to hell,” “God hates you,” “Semper fi fags,” and “Thank God for dead soldiers.” Phelps testified that it was Defendants’ “duty” to deliver the message “whether they want to hear it or not.” Lance Cpl. Snyder’s funeral was thus utilized by Defendants as the vehicle for this message.
It was undisputed at trial that Defendants complied with local ordinances and police directions with respect to being a certain distance from the church. Furthermore, it was established at trial that Snyder did not actually see the signs until he saw a television program later that day with footage of the Phelps family at his son’s funeral.
Defendants’ utilization of Matthew Snyder’s funeral to publicize their message continued after the actual funeral on March 10, 2006. After returning to Kansas, Phelps-Roper published an “epic” on the church’s website, www. godhatesfags.com. In “The Burden of Marine Lance Cpl. Matthew Snyder,” Phelps-Roper stated that Albert Snyder and his ex-wife “taught Matthew to defy his creator,” “raised him for the devil,” and “taught him that God was a liar.” In the aftermath of his son’s funeral, Snyder learned that there was reference to his son on the Internet after running a search on Google. Through the use of that search engine, he read Phelps-Roper’s “epic” on the church’s website.
Snyder v. Phelps, 533 F.Supp.2d 567, 571-72 (D.Md.2008) (internal citation omitted).[1]
B.
1.
When Albert Snyder filed his complaint in June 2006, he sued Fred W. Phelps, Sr., and the Church, later adding its members Shirley L. Phelps-Roper and Rebekah A. Phelps-Davis as defendants. The complaint alleged five state law tort claims: defamation, intrusion upon seclusion, publicity given to private life, IIED, and civil conspiracy. The Defendants moved for summary judgment on those claims, contending, inter alia, that their challenged words “constitute[ ] expressions of opinion, which are not actionable.” J.A. 239.[2] They asserted that their words “are clear *213 ly rhetorical, hypothetical, religious and laced with opinion,” and that “it is impossible to prove or disprove these things, particularly given that doctrinal viewpoints drive the opinions.” Id.
On October 15, 2007, the district court granted summary judgment to the Defendants on two of the five tort claims: defamation and publicity given to private life.[3] The court awarded summary judgment on the defamation claim because the Defendants’ speech was “essentially ... religious opinion” and “would not realistically tend to expose Snyder to public hatred or scorn.” Snyder, 533 F.Supp.2d at 572-73. On the publicity given to private life claim, the court awarded summary judgment because the Defendants had not made public any private information. In so ruling, the court explained that the Defendants had published only information gleaned from a newspaper obituary and that such publication would not be highly offensive to a reasonable person, because the information was already a matter of public record.
In October 2007, the parties proceeded to trial on the remaining three claims of the complaint: intrusion upon seclusion, IIED, and civil conspiracy. At trial, Snyder testified, “recounting] fond memories of his son ... and the traumatic news of his passing.” Snyder, 533 F.Supp.2d at 588. In its Post-Trial Opinion, the district court summarized Snyder’s testimony:
He described the severity of his emotional injury, stating that he is often tearful and angry, and that he becomes so sick to his stomach that he actually physically vomits. He testified that Defendants placed a “bug” in his head, such that he is unable to separate thoughts of his son from the [Defendants’] actions: “there are nights that I just, you know, I try to think of my son at times and every time I think of my son or pass his picture hanging on the wall or see the medals hanging on the wall that he received from the [M]arine [C]orps, I see those signs.” He testified also that “I want so badly to remember all the good stuff and so far, I remember the good stuff, but it always turns into the bad.”
Plaintiff also testified as to the permanency of the emotional injury. He testified that “I think about the sign [i.e., Thank God for dead soldiers] every day of my life.... I see that sign when I lay in bed at nights. I [had] one chance to bury my son and they took the dignity away from it. I cannot re-bury my son. And for the rest of my life, I will remember what they did to me and it has tarnished the memory of my son’s last hour on earth.” He stated also that “somebody could have stabbed me in the arm or in the back and the wound would have healed. But I don’t think this will heal.”
Throughout trial, Plaintiff demonstrated significant emotion, appearing visibly shaken and distressed, and was often reduced to tears. On occasion during the trial, Plaintiff requested and was granted leave from the courtroom to compose himself. The jury witnessed firsthand Plaintiffs anguish and the unresolved grief he harbors because of the failure to conduct a normal burial.
Id. at 588-89 (second and third alterations in original) (internal citations omitted).
Snyder called several expert witnesses to testify concerning the injuries the Defendants had caused him, including the worsening of his diabetes and severe depression. Snyder’s treating physician confirmed that the Defendants’ actions had *214 exacerbated Snyder’s depression, thereby preventing him from going through the normal grieving process. See Snyder, 533 F.Supp.2d at 588. Snyder’s psychologist testified “that the demonstration and the things that [Plaintiff] talked about [seeing] in the website ... have made the depression worse and lengthened it.” Id. (alterations in original).
During the summary judgment proceedings and the trial, the Defendants repeatedly contended that the First Amendment protects their actions.[4] In that regard, the district court recognized that certain signs carried by the Defendants — such as “America Is Doomed” and “God Hates America” — “express[ed] general points of view” that may have merited First Amendment protection. Snyder, 533 F.Supp.2d at 578. But the court ruled that certain other signs — such as “Thank God for Dead Soldiers,” “Semper Fi Fags,” “You’re Going to Hell,” and “God Hates You” — created issues of fact for the jury because they “could be interpreted as being directed at the Snyder family.” Id. Likewise, the court concluded that statements published in the Epic on the Church website “created similar issues to be addressed by the finder of fact.” Id.
At trial, the Defendants challenged the propriety of the proposed jury instructions regarding the First Amendment.[5] During a hearing on jury instructions, the Defendants specifically objected to Instruction No. 21, which provided in full as follows:
The Defendants in this ease claim that their actions were protected by the First Amendment of the United States Constitution, which provides that Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech. The Defendants have a right under the First Amendment to engage in picketing, and to publish their religious message, no matter how much you may disagree with that message. The First Amendment applies to action at the state and local level through the Fourteenth Amendment.
As a general matter, the fact that society may find speech offensive is not a sufficient reason for suppressing it. Speech that is called hateful, or speech that is unpopular, or speech with which you strongly disagree, may still be protected speech. The government, including the courts, can place reasonable time, place, and manner restrictions on how protected speech may be expressed. These restrictions must be narrowly tailored, and should balance the interests of all the people involved. Speech that is vulgar, offensive, and shocking ... is not entitled to absolute constitutional protection under all circumstances.
The United States Supreme Court has long recognized that not all speech is of equal First Amendment protection. When speech gives rise to civil tort liability, the level of First Amendment protection varies depending on the nature and subject matter of the speech.
As to the particular subject matter of the speech, a distinction has been drawn between matters of public and private concern. Where the speech is directed at private people and matters of private *215 concern, the Supreme Court has held that the First Amendment interest in protecting particular types of -speech must be balanced against a state’s interest in protecting its residents from wrongful injury. You must balance the Defendants’ expression of religious belief with another citizen’s right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress. As I have previously indicated to you at the start of this case, you as the judges of the facts in this case must determine whether the Defendants’ actions were directed specifically at the Snyder family. If you do so determine, you must then determine whether those actions would be highly offensive to a reasonable person, whether they were extreme and outrageous and whether these actions were so offensive and shocking as to not be entitled to First Amendment protection.
J.A. 3113-14 (alteration and omissions in original) (internal quotation marks omitted). In objecting to Instruction No. 21, the Defendants asserted that “the First Amendment has more of a heavy balance even in civil cases than just anybody not wanting to be offended.” Id. at 2883. Phelps-Roper, who was defending herself on a pro se basis, further objected, stating: “I just want to say that ... it has never been clear in the record or to me what of our words are actionable and ... [the court has] not limited the evidence to those words that you would say were directed to a specific family.” Id. at 2884. The court overruled the objections to Instruction No. 21, observed that the constitutional issues were preserved, and gave the instruction to the jury.
2.
On October 31, 2007, the jury found for Snyder on the three tort claims, awarding him $2.9 million in compensatory damages and a total of $8 million in punitive damages. After the district court entered judgment on November 5, 2007, the Defendants filed post-trial motions seeking judgment as a matter of law, judgment notwithstanding the verdict, reconsideration and rehearing, a new trial, relief from judgment, and relief of law and equity. The district court denied each of these motions by its Post-Trial Opinion. The Defendants also moved for a remittitur, contending that the verdict was grossly excessive.
In its Posh-Trial Opinion of February 4, 2008, the district court disposed of the Defendants’ various legal challenges. The Post-Trial Opinion explained that this case “involves balancing [the Defendants’ First Amendment rights of religious expression] with the rights of other private citizens to avoid being verbally assaulted by outrageous speech and comment during a time of bereavement.” Snyder, 533 F.Supp.2d at 579. As to the “content of the signs,” the court was satisfied that it had “instructed the jury on the First Amendment, specifically the balance between Defendants’ First Amendment rights and Maryland’s interest in protecting its citizens,” such that there “was sufficient evidence in the trial record for a reasonable jury to conclude that Defendants’ conduct was so extreme and outrageous as to cause Plaintiffs injury.” Id. at 581. The court also rejected the Defendants’ post-trial contention that the court “should have held as a matter of law that [the Defendants] were entitled to First Amendment protection.” Id. at 582. The court emphasized that it had permitted the jury to decide if the Defendants’ conduct was sufficient to hold them liable on the three Maryland tort claims, and the jury had found the Defendants liable. See id. at 580-82.
Finally, by its Posh-Trial Opinion, the district court upheld the compensatory *216 damages award but remitted the punitive damages award to a total of $2.1 million, resulting in an aggregate judgment of $5 million. The Defendants have now appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[6]
II.
The Defendants’ primary appellate contention is that the judgment contravenes the First Amendment. In addition to their First Amendment contentions, the Defendants raise the following other issues: that the district court lacked personal and subject matter jurisdiction; that Snyder had no privacy right in Matthew’s funeral; that the punitive damages award contravenes due process; that the jury was impermissibly biased; that the district court made prejudicial evidentiary errors at trial; that the civil conspiracy verdict is inconsistent with state law; and that Maryland’s statutory cap on compensatory damages applies to the damages award. We are content to reject each of these non-First Amendment contentions without farther discussion because they are all plainly without merit.[7]
Notably, the Defendants do not challenge the sufficiency of the evidence, although an amicus brief seeks to raise that issue. Our good colleague Judge Shedd would reverse the judgment against the Defendants on the issue of evidence sufficiency that is asserted only by the amicus submission. In that respect, we agree that, although the Defendants properly raised the sufficiency issue in the district court, they have abandoned that contention on appeal. Thus, the Defendants and their counsel have exercised their discretion and voluntarily waived the sufficiency issue. Notwithstanding such waiver, however, Judge Shedd would reverse the judgment because he agrees with the amicus that the supporting evidence was insufficient.
We respectfully reject our good friend’s reliance on the amicus contention, because the evidentiary issue has plainly been waived by the only party entitled to pursue it. As a result, the First Amendment contention must be addressed. Put simply, our Court and our sister circuits have consistently been wary, even prohibitive, of addressing an issue raised solely by an amicus. See United States v. Buculei, 262 F.3d 322, 333 n. 11 (4th Cir.2001) (“ ‘An issue waived by appellant cannot be raised by amicus curiae.’ ”) (quoting Christopher M. v. Corpus Christi Indep. Sch. Dist., 933 F.2d 1285, 1293 (5th Cir.1991)); Cavallo v. Star Enter., 100 F.3d 1150, 1152 n. 2 (4th Cir.1996) (declining to address issue not raised in opening brief, as it would be “unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues” (internal quotation marks omitted)). Indeed, “ ‘[a]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal.’ ” Buculei, 262 F.3d at 333 n. 11 (quoting Amoco Oil Co. v. United States, 234 F.3d 1374, 1378 (Fed.Cir.2000)). But see Spicer v. Hilton, 618 F.2d 232, 240 (3d Cir.1980) (concluding that constitutional issues should yield to nonconstitutional ones, even where non-constitutional issues were not raised by *217 parties). As the Federal Circuit has aptly described such a situation, “[i]t is the appellant’s case, not a joint appeal by the appellant and amicus. Appellant must raise in its opening brief all the issues it wishes the court to address.” Amoco Oil, 234 F.3d at 1378.
On the other hand, we acknowledge that the Supreme Court has seen fit, in narrow and circumscribed circumstances of its own choosing, to address and dispose of an issue raised solely by an amicus. See Teague v. Lane, 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (addressing retroactivity issue on appeal because “th[e] question is not foreign to the parties,” who addressed retroactivity with respect to another claim); see also Davis v. United States, 512 U.S. 452, 457 n. * (1994) (recognizing that Supreme Court may assess contentions raised only in amicus brief, but declining to do so). With all respect to the Supreme Court’s treatment of the waiver issue in Teague and Davis, this situation does not warrant an exception to our post-Teague circuit precedent.[8] Because the Defendants have voluntarily waived any contention that the evidence is insufficient to support the verdict, we are obligated to grapple with and resolve the First Amendment issues presented by the judgment.[9]
III.
With respect to the First Amendment issue, the Defendants maintain that they were entitled to judgment as a matter of law because the First Amendment fully protects their speech at the Maryland protest and in the written Epic they published on the Internet. We will first address the Defendants’ assertion that the court erroneously permitted the jury to decide legal issues reserved to the court. Such an error would garner the Defendants a new trial, but there is no need for a new trial if the Defendants were entitled to prevail under the First Amendment. Thus, after describing the general legal frame-work applicable here, we specifically address the application of that legal framework to the Defendants’ various protest signs and their written Epic.
A.
It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment. See New York Times Co. v. Sullivan, 376 U.S. 254, 264-65, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[10] Although the Supreme Court in New York Times specifically addressed the common law tort of defamation, the Court explained that its reasoning did not *218 turn on the precise “form in which state power has been applied.” Id. at 265, 84 S.Ct. 710. Accordingly, the Court later applied the First Amendment to other torts not involving reputational damages, see Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (IIED), and we have applied the Court’s controlling principles to other state law torts, see Food Lion v. Capital Cities/ABC, Inc., 194 F.3d 505, 511, 522 (4th Cir.1999) (fraud, breach of duty of loyalty, and trespass). Thus, regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant’s speech. See id. at 523.[11]
Where, as here, the First Amendment is implicated by the assertion of tort claims arising from speech, we have the obligation “to ‘make an independent examination of the whole record’ in order to make sure that ‘the judgment does not constitute a forbidden intrusion on the field of free expression.’ ” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting New York Times, 376 U.S. at 284-86, 84 S.Ct. 710); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (referring to the review required by Bose Corp. as “enhanced appellate review”). We review de novo a district court’s conclusions of law with respect to a First Amendment issue. See United States v. Bly, 510 F.3d 453, 457 (4th Cir.2007).
In its New York Times decision, the Supreme Court established a rule barring public officials from recovering damages for the common law tort of defamation unless the allegedly defamatory statement was made with “actual malice,” and the Court defined such malice as knowing falsity or reckless disregard for the truth. 376 U.S. at 279-80, 84 S.Ct. 710. The Court later expanded that constitutional standard to speech concerning “public figures” as well as “public officials,” Curtis Publ’g Co. v. Butts, 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in the result), but stopped short of extending its protective rule to speech targeting private figures, see Gertz v. Robert Welch, Inc., 418 U.S. 323, 344-46, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
Nevertheless, in a distinct but related line of decisions, the Court has recognized that there are constitutional limits on the type of speech to which state tort liability may attach. See Milkovich, 497 U.S. at 16, 110 S.Ct. 2695; Hustler Magazine, 485 U.S. at 50, 108 S.Ct. 876; see also Deupree v. Iliff, 860 F.2d 300, 304-05 (8th Cir.1988) (recognizing that certain types of speech are protected regardless of plaintiffs status as private or public figure). Thus, although there is no categorical constitutional defense for statements of “opinion,” the First Amendment will fully protect “statements that cannot ‘reasonably [be] interpreted as stating actual facts’ about an individual.” Milkovich, 497 U.S. at 20, 110 S.Ct. 2695 (alteration in original) (quoting Hustler Magazine, 485 U.S. at 50, 108 S.Ct. 876).[12]
In Milkovich, which is a crucial precedent in our disposition of this appeal, the *219 Supreme Court declined to adopt an artificial dichotomy between “opinion” and “fact,” and it specifically eschewed the multifactor tests that several lower courts (including this Court) had utilized to categorize speech. See 497 U.S. at 19, 110 S.Ct. 2695; see also Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 183-84 (4th Cir.1998) (explaining that Milkovich rejected our multifactor test). In Milkovich, the Court assessed whether a newspaper enjoyed First Amendment protection for a column that referred to a wrestling coach as a “liar,” based on his allegedly deceitful testimony before a state athletics council. 497 U.S. at 4-5 & n. 2, 110 S.Ct. 2695. The newspaper maintained that the column merely stated its author’s opinion, and was thus subject to categorical First Amendment protection. Id. at 17-18, 110 S.Ct. 2695. The Court rejected this contention, ruling instead that the “dispositive question” was “whether a reasonable factfinder could conclude that the statements in the [newspaper] column imply an assertion that [the coach] perjured himself in a judicial proceeding.” Id. at 21, 110 S.Ct. 2695. Concluding that the column’s assertions were “susceptible of being proved true or false,” the Court determined that they were not protected by the First Amendment. Id.
In light of Milkovich, and as carefully explained by Judge Motz in our Biospherics decision, we are obliged to assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message. See Biospherics, 151 F.3d at 184. And we must emphasize the “verifiability of the statement,” because a statement not subject to objective verification is not likely to assert actual facts. Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir.1993); see also Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir.1993) (“[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.”).
There are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual, and that thus constitute speech that is constitutionally protected. First, the First Amendment serves to protect statements on matters of public concern that fail to contain a “provably false factual connotation.” Milkovich, 497 U.S. at 20, 110 S.Ct. 2695.[13] We assess as a matter of *220 law whether challenged speech involves a matter of public concern by examining the content, form, and context of such speech, as revealed by the whole record. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). “Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.” Kirby v. City of Elizabeth City, N.C., 388 F.3d 440, 446 (4th Cir.2004).[14] In order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of “paramount importance or national scope.” Levinsky’s, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 132 (1st Cir. 1997).
Second, rhetorical statements employing “loose, figurative, or hyperbolic language” are entitled to First Amendment protection to ensure that “public debate will not suffer for lack of ‘imaginative expression’ or the ‘rhetorical hyperbole’ which has traditionally added much to the discourse of our Nation.” Milkovich, 497 U.S. at 20-21, 110 S.Ct. 2695. The general tenor of rhetorical speech, as well as the use of “loose, figurative, or hyperbolic language” sufficiently negates any impression that the speaker is asserting actual facts. Id. at 21, 110 S.Ct. 2695; see also Letter Carriers v. Austin, 418 U.S. 264, 284-86, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (concluding that reference to worker who crossed picket line as “traitor” was not actionable); Greenbelt Coop. Publ’g Ass’n v. Bresler, 398 U.S. 6, 13-14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (treating description of negotiating position as “blackmail” as epithet not conveying commission of actual crime). We assess as a matter of law whether speech contains rhetorical hyperbole protected by the First Amendment. See CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 294 (4th Cir.2008).
We had occasion to apply these legal principles just last year in our CACI decision. See 536 F.3d at 293. CACI was a civilian defense contractor that performed interrogation services for the military at Abu Ghraib prison in Iraq. CACI claimed that it had been defamed by a talk radio host who had made on-air statements blaming CACI for the mistreatment of detainees at the prison and criticizing the use of wartime contractors in general. See id. at 288-92. Judge Michael’s opinion affirmed the summary judgment award to the radio host, based in part on the determination that her statements were protected by the First Amendment because they “did not state actual facts about CACI.” Id. at 304.[15]
The radio host, for example, had claimed that CACI and other defense contractors employed “[m]ercenaries all over the country, killing people,” and she had characterized CACI and other contractors as “hired killers.” CACI, 536 F.3d at 301 (alteration in original). Judge Michael explained that no reasonable listener would understand the challenged statements to assert actual *221 facts about CACI, but rather would understand them as “exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq.” Id. at 301-02. The radio host had twice mentioned that certain individuals working for contractors in Iraq fought for apartheid in South Africa. See id. at 302. Those statements also could not reasonably be interpreted as stating actual facts about CACI: they were properly understood as referring to individual employees of the contractors, as opposed to the contractors themselves, and the host had simply used “loose and hyperbolic terms” to press her case against the government’s use of military contractors. Id.
B.
In this proceeding, Snyder was awarded judgment against the Defendants on three of the tort claims asserted in the Amended Complaint: intrusion upon seclusion, IIED, and civil conspiracy. By these claims, Snyder sought damages for injuries to his state of mind only, and not for pecuniary loss. Thus, the verdict in favor of Snyder can only be sustained if it is consistent with the Defendants’ First Amendment guarantees. See Food Lion, 194 F.3d at 522 (foreclosing any attempt to recover damages under “non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim”). As explained below, the Defendants correctly contend that the district court erred in permitting the jury to decide legal issues reserved to the court, and then by denying the Defendants’ request for judgment as a matter of law.
1.
Assuming that the district court otherwise applied the proper legal standards to its analysis of the Defendants’ First Amendment contentions, it fatally erred by allowing the jury to decide relevant legal issues. Instruction No. 21, to which Defendants carefully objected at trial, explained to the jury that certain speech, including that which is “vulgar, offensive, and shocking,” is not entitled to “absolute constitutional protection.” J.A. 3113. It also explained that the protections accorded under the First Amendment vary with the “nature and subject matter of the speech,” and the instruction suggested that, when speech on matters of private concern is directed at private figures, the First Amendment “must be balanced against” the state’s interest in protecting its citizens. Id. at 3114.
The district court thus decided that it was for the jury — not the court — to assess the preliminary issue of the nature of the speech involved, and to then decide whether such speech was protected by the Free Speech Clause. Thus, the jury was erroneously tasked with deciding whether the Defendants’ speech was “directed specifically at the Snyder family,” and, if so, whether it was so “offensive and shocking as to not be entitled to First Amendment protection.” J.A. 3114; see also id. (“You must balance the Defendants’ expression of religious belief with another citizen’s right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress.”). At the least, therefore, the judgment must be vacated and a new trial awarded, in that Instruction No. 21 authorized the jury to determine a purely legal issue, namely, the scope of protection afforded to speech under the First Amendment.[16]
As previously noted, however, a new trial is unnecessary if the Defendants can *222 prevail as a matter of law after our independent examination of the whole record. See Milkovich, 497 U.S. at 17, 110 S.Ct. 2695. We are thus obliged to apply the applicable legal framework to the Defendants’ various protest signs and written Epic, and decide if the Defendants are entitled to judgment as a matter of law.
2.
The district court also erred when it utilized an incorrect legal standard in its Post-Trial Opinion. In assessing the Defendants’ First Amendment contentions, the court focused almost exclusively on the Supreme Court’s opinion in Gertz, which it read to limit the First Amendment’s protections for “speech directed by private individuals against other private individuals.” Snyder v. Phelps, 533 F.Supp.2d 567, 577 (D.Md.2008). The court therefore assessed whether Snyder was a “public figure” under Gertz and whether Matthew’s funeral was a “public event.” See id.[17]
The Supreme Court has created a separate line of First Amendment precedent that is specifically concerned with the constitutional protections afforded to certain types of speech, and that does not depend upon the public or private status of the speech’s target. See Milkovich, 497 U.S. at 16, 110 S.Ct. 2695; Hustler Magazine, 485 U.S. at 50, 108 S.Ct. 876. Thus, even if the district court (as opposed to the jury) concluded that Snyder and his son were not “public figures,” such a conclusion alone did not dispose of the Defendants’ First Amendment contentions. In focusing solely on the status of the Snyders and the funeral, and not on the legal issue concerning the nature of the speech at issue, the court failed to assess whether the pertinent statements could reasonably be interpreted as asserting “actual facts” about an individual, or whether they instead merely contained rhetorical hyperbole. See Milkovich, 497 U.S. at 20, 110 S.Ct. 2695; CACI, 536 F.3d at 293. Whether a statement can reasonably be interpreted as stating actual facts about an individual is a question of law for the court, see CACI, 536 F.3d at 293-94, and the district court failed to consider that issue in its Post-Trial Opinion. Consequently, we must assess the content of the Defendants’ protest signs as well as the Epic, and determine whether such speech is entitled to constitutional protection.
a.
The following signs displayed by the Defendants, which are similar in both their message and syntax, can readily be assessed together: “America is Doomed,” “God Hates the USA/Thank God for 9/11,” “Pope in Hell,” “Fag Troops,” “Semper Fi Fags,” “Thank God for Dead Soldiers,” “Don’t Pray for the USA,” “Thank God for IEDs,” “Priests Rape Boys,” and “God Hates Fags.”[18] As a threshold matter, as *223 utterly distasteful as these signs are, they involve matters of public concern, including the issue of homosexuals in the military, the sex-abuse scandal within the Catholic Church, and the political and moral conduct of the United States and its citizens. Such issues are not subjects of “purely private concern,” Dun & Bradstreet, 472 U.S. at 759, 105 S.Ct. 2939, but rather are issues of social, political, or other interest to the community, see, e.g., Acanfora v. Bd. of Educ. of Montgomery County, 491 F.2d 498, 500-01 (4th Cir. 1974) (holding that speech concerning homosexuality was matter of public concern). As explained in one of the amicus submissions, for example, a public firestorm erupted in 2001 after two prominent religious figures, Jerry Falwell and Pat Robertson, alleged that the September 11th terrorist attacks represented God’s punishment for our country’s attitudes regarding homosexuality and abortion. See John F. Harris, “God Gave U.S. ‘What We Deserve,’ Falwell Says,” Wash. Post, Sept. 14, 2001, at C3.
Additionally, no reasonable reader could interpret any of these signs as asserting actual and objectively verifiable facts about Snyder or his son. The signs reading “God Hates the USA/Thank God for 9/11” and “Don’t Pray for the USA,” for example, are not concerned with any individual, but rather with the nation as a whole. Other signs (those referring to “fags,” “troops,” and “dead soldiers”) use the plural form, which would lead a reasonable reader to conclude that the speaker is referring to a group rather than an individual. Additional signs are concerned with individuals, such as the Pope, who are entirely distinct from Snyder and his son, or with groups, such as priests, to which neither Snyder nor his son belong. Finally, those signs stating “Thank God for Dead Soldiers” and “Thank God for IEDs” only constitute a reference to Snyder’s son if the reader makes the assumption that their only object is Matthew Snyder and not the thousands of other soldiers who have died in Iraq and Afghanistan, often as a result of IEDs.
Even if the language of these signs could reasonably be read to imply an assertion about Snyder or his son, the statements are protected by the Constitution for two additional reasons: they do not assert provable facts about an individual, and they clearly contain imaginative and hyperbolic rhetoric intended to spark debate about issues with which the Defendants are concerned. See CACI, 536 F.3d at 301. Whether “God hates” the United States or a particular group, or whether America is “doomed,” are matters of purely subjective opinion that cannot be put to objective verification. The statement “Thank God,” whether taken as an imperative phrase or an exclamatory expression, is similarly incapable of objective verification. And, as heretofore explained, a reasonable reader would not interpret the signs that could be perceived as including verifiable facts, such as “Fag Troops” and “Priests Rape Boys,” as asserting actual facts about Snyder or his son. To the contrary, these latter statements, as well as others in this category, consist of offensive and hyperbolic rhetoric designed to spark controversy and debate. By employing God, the strong verb “hate,” and graphic references to terrorist attacks, the Defendants used the sort of “loose, figurative, or hyperbolic language” that seriously negates any impression that the speaker is asserting actual facts about an individual. Milkovich, 497 U.S. at 21, 110 S.Ct. 2695. Accordingly, we are constrained to agree that these signs — “America is Doomed,” “God Hates the USA/Thank God for 9/11,” “Pope in Hell,” “Fag Troops,” “Semper Fi Fags,” “Thank God for Dead Soldiers,” “Don’t Pray for the USA,” “Thank God for IEDs,” “Priests Rape Boys,” and “God *224 Hates Fags” — are entitled to First Amendment protection.
b.
The reasonable reader’s reaction to two other signs — “You’re Going to Hell” and “God Hates You” — also must be specifically addressed, as these two signs present a closer question. We must conclude, however, that these two signs cannot reasonably be interpreted as stating actual facts about any individual. The meaning of these signs is ambiguous because the pronoun “you” can be used to indicate either the second person singular or plural form.[19] A reasonable reader could interpret these signs, therefore, as referring to Snyder or his son only, or, on the other hand, to a collective audience (or even the nation as a whole).
We need not resolve this question of usage, however, because a reasonable reader would not interpret the statements on these two signs as asserting actual and provable facts. Whether an individual is “Going to Hell” or whether God approves of someone’s character could not possibly be subject to objective verification. Thus, even if the reasonable reader understood the “you” in these signs to refer to Snyder or his son, no such reader would understand those statements (“You’re Going to Hell” and “God Hates You”) to assert provable facts about either of them.
Additionally, as with the other signs, both of these signs contain strong elements of rhetorical hyperbole and figurative expression. As we have recognized, the “context and tenor” of the speech at issue, as well as the speaker’s use of “irreverent and indefinite language,” can serve to negate any impression that he is asserting actual facts about an individual. Biospherics, 151 F.3d at 184-85. The general context of the speech in this proceeding is one of impassioned (and highly offensive) protest, with the speech at issue conveyed on handheld placards. A distasteful protest sign regarding hotly debated matters of public concern, such as homosexuality or religion, is not the medium through which a reasonable reader would expect a speaker to communicate objectively verifiable facts. In addition, the words on these signs were rude, figurative, and incapable of being objectively proven or disproven. Given the context and tenor of these two signs, a reasonable reader would not interpret them as asserting actual facts about either Snyder or his son.
c.
Finally, the written Epic published on the website of the Church is also protected by the First Amendment, in that a reasonable reader would understand it to contain rhetorical hyperbole, and not actual, provable facts about Snyder and his son. The First Amendment issue concerning the Epic presents a somewhat more difficult question, however, because it is entitled “The Burden of Marine Lance Cpl. Matthew A. Snyder.” J.A. 3788. Such a title could lead a reasonable reader to initially conclude that the Epic asserts facts about this particular soldier. The Epic’s subtitle, however, immediately connects its contents to the Defendants’ protest and the various signs displayed there; “The Visit of Westboro Baptist Church to Help the Inhabitants of Maryland Connect the Dots! This Epic Adventure Took Place on Friday, March 10, 2006.” Id. The Epic has a photograph of the funeral protest immediately below its title, followed by nearly two pages of verbatim Bible verses. Id. at 3788-89.
*225 The Epic then discusses Matthew’s life: “Twenty years ago, little Matthew Snyder came into the world.... God created him and loaned/entrusted him to Albert and Julie Snyder.” J.A. 3790. The Epic states that the Snyders “had a DUTY to prepare that child to serve the LORD his GOD — PERIOD! You did JUST THE OPPOSITE — you raised him for the devil. You taught him that God was a liar.” Id. at 3791. The Epic also focuses on Matthew’s upbringing, asserting that “Albert and Julie ... taught Matthew to defy his Creator, to divorce, and to commit adultery. They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity. ... They also, in supporting satanic Catholicism, taught Matthew to be an idolater.” Id. After interspersing additional excerpts from the Bible, the Epic refers to Matthew’s service in the military, noting that he fought for
the United States of Sodom, a filthy country that is in lock step with his evil, wicked[,] and sinful manner of life, putting him in the cross hairs of a God that is so mad He has smoke coming from his nostrils and fire from his mouth! How dumb was that?
Id. The Epic then links Matthew’s death to the Defendants’ protest activities, stating:
God rose up Matthew for the very purpose of striking him down, so that God’s name might be declared throughout all the earth. He killed Matthew so that His servants would have an opportunity to preach His words to the U.S. Naval Academy at Annapolis, the Maryland Legislature, and the whorehouse called St. John Catholic Church at Westminster where Matthew Snyder fulfilled his calling.
Id. at 3973.
Notwithstanding the foregoing, the Epic cannot be divorced from the general context of the funeral protest. Indeed, it is patterned after the hyperbolic and figurative language used on the various signs. Again, in assessing the First Amendment issue, we must evaluate a reasonable reader’s reaction to the Epic, in light of its context and general tenor. See Biospherics, 151 F.3d at 184-85. In context, the Epic is a recap of the protest and was distributed through the Church website, which would not lead the reasonable reader to expect actual facts about Snyder or his son to be asserted therein.
The general tenor of the Epic also serves to negate any impression that it was the source of any actual facts. In preparing it, the Defendants interspersed strong, figurative language with verses from the Bible. They utilized distasteful and offensive words, atypical capitalization, and exaggerated punctuation, all of which suggest the work of a hysterical protestor rather than an objective reporter of facts. Despite referring to the Snyder family by name, the Epic is primarily concerned with the Defendants’ strongly held views on matters of public concern. Indeed, the Epic explains that Matthew’s death in Iraq gave the Defendants the “opportunity to preach [God’s] words to the U.S. Naval Academy at Annapolis [and] the Maryland Legislature,” J.A. 3973, where they protested on the very day of Matthew’s funeral. Finally, the Defendants’ extensive funeral picketing activities predated Matthew’s funeral and continue to this day throughout the country, with many of the signs displayed at Matthew’s funeral also being displayed in other protests.
Thus, even when the Snyders are mentioned in the Epic, a reasonable reader would understand its contents to be primarily focused on the more general message to which their protests are directed. The Defendants assert in the Epic, for *226 example, that the Snyders had incurred God’s wrath by raising Matthew as a Catholic and allowing him to serve in the military — assertions a reasonable reader would take as focused on the Defendants’ concerns with the policies and activities of the Roman Catholic Church and the military. Furthermore, a reasonable reader would take as rhetorically hyperbolic a text describing the “United States of Sodom” as a “filthy” country, labelling the Catholic Church as a “pedophile machine,” and equating the Maryland Legislature with the Taliban. In that context, the reasonable reader would understand the other assertions of the Epic — that the Snyders raised their son “for the devil,” and taught him to “defy his Creator, to divorce, and to commit adultery”- — -as simply “loose, figurative, or hyperbolic language” not connoting actual facts about Matthew or his parents. Milkovich, 497 U.S. at 21, 110 S.Ct. 2695. Thus, a reasonable reader would not understand the Epic to assert actual facts about either Snyder or his son.[20]
C.
Notwithstanding the distasteful and repugnant nature of the words being challenged in these proceedings, we are constrained to conclude that the Defendants’ signs and Epic are constitutionally protected. To paraphrase our distinguished colleague Judge Hall, judges defending the Constitution “must sometimes share [their] foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply. It is a fair summary of history to say that the safeguards of liberty have often been forged in controversies involving not very nice people.” Kopf v. Skyrm, 993 F.2d 374, 380 (4th Cir.1993) (internal quotation marks omitted).
Nonetheless, the various states and localities, as well as grieving families, may yet protect the sanctity of solemn occasions such as funerals and memorials. Indeed, governmental bodies are entitled to place reasonable and content-neutral time, place, and manner restrictions on activities that are otherwise constitutionally protected. Some “breathing space” for contentious speech is essential, however, under the Free Speech Clause. See New York Times, 376 U.S. at 272, 84 S.Ct. 710. As the Court long ago emphasized:
To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of citizens of a democracy.
Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Because the judgment attaches tort liability to constitutionally protected speech, the district court erred in declining to award judgment as a matter of law.
IV.
Pursuant to the foregoing, the judgment of the district court is reversed and the various appeal bonds are hereby discharged.

JUDGMENT REVERSED AND BONDS DISCHARGED

. The Defendants have a substantial history of protesting at venues other than soldiers' funerals. For example, on the day of Matthew Snyder's funeral, they also protested in Annapolis at the Maryland State House and at the Naval Academy. The Defendants have also been involved in litigation throughout the country relating to their protests. See, e.g., Phelps-Roper v. Nixon, 545 F.3d 685 (8th Cir. 2008); Phelps-Roper v. Strickland, 539 F.3d 356 (6th Cir.2008). As a result of such activities, approximately forty states and the federal government have enacted legislation addressing funeral picketing. See Stephen R. McAllister, Funeral Picketing Laws and Free Speech, 55 U. Kan. L.Rev. 575, 576 (2007).

. Citations herein to "J.A. _” refer to the contents of the Joint Appendix filed by the parties in this appeal.

. Snyder has not cross-appealed the district court's summary judgment awards to the Defendants on his tort claims for defamation and publicity given to private life. Thus, whether the court erred in making those rulings is not implicated in this appeal.

. The Free Speech Clause of the First Amendment specifically guarantees that "Congress shall make no law ... abridging the freedom of speech." U.S. Const, amend. I. The Free Speech Clause applies to the various states as a result of the Fourteenth Amendment. See Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

. In objecting to a proposed instruction on the intrusion upon seclusion claim, the Defendants sought to limit the jury’s consideration to three specific signs. The trial court, however, authorized the jury to consider all of the signs as well as the Epic.

. Each of the Defendants requested a stay of execution of judgment pending appeal, which the district court conditionally granted. Phelps and the Church were then required to post property bonds, and Phelps-Roper and Phelps-Davis had to post substantial cash bonds. On May 19, 2008, we denied the requests of Phelps-Roper and Phelps-Davis to stay the judgment without bond pending appeal.

. The Defendants also assert on appeal that we improperly denied the requests of Phelps-Roper and Phelps-Davis to stay the judgment without bond pending appeal. As explained below, we discharge the various bonds as a corollary to reversing the judgment.

. In this regard, we further observe that recognition of the right of an amicus to present an issue that the parties have no desire to further litigate would constitute judicial recognition of a lawyer relief rule — inviting lawyers and nonparties otherwise without standing to seek out and engage in mischief that would readily be likened to barratry, champerty, or maintenance.

. Because the sufficiency of the evidence issue was waived, the Askwander principle— that a court should not “decide questions of a constitutional nature unless absolutely necessary” — is inapplicable here. See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (internal quotation marks omitted). The resolution of the First Amendment issues is absolutely necessary, as it is the sole appropriate means for disposing of this appeal.

. The district court properly distinguished these proceedings, where the Defendants contend that the First Amendment immunizes them from tort liability, from other decisions relied on by the Defendants addressing the constitutionality of statutory prohibitions affecting funeral pickets. See Snyder v. Phelps, 533 F.Supp.2d 567, 578-79 (D.Md.2008) (distinguishing certain "successful attacks by the [Defendants] upon statutory restrictions” that have not met constitutional muster).

. The Supreme Court has deemed the First Amendment defense inapplicable to a state law tort claim only when the plaintiff seeks damages for actual pecuniary loss, as opposed to injury to reputation or state of mind. See Cohen v. Cowles Media Co., 501 U.S. 663, 671, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (concluding that First Amendment did not bar economic damages resulting from defendant's tortious breach of promise).

. There is no suggestion that the speech at issue falls within one of the categorical exclusions from First Amendment protection, such as those for obscenity or "fighting words.” See, e.g., Miller v. California, 413 U.S. 15, 20, *219 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Chaplinsky v. New Hampshire, 315 U.S. 568, 571—72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

. Neither the Supreme Court nor this Court has specifically addressed the question of whether the constitutional protections afforded to statements not provably false should apply with equal force to both media and nonmedia defendants. See Milkovich, 497 U.S. at 20 n. 6, 110 S.Ct. 2695. The Second and Eighth Circuits, however, have rejected any media/nonmedia distinction. See Flamm v. Am. Ass’n of Univ. Women, 201 F.3d 144, 149 (2d Cir.2000); In re IBP Confidential Bus. Documents Litig., 797 F.2d 632, 642 (8th Cir. 1986); see also Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1563 n. 39 (4th Cir.1994) (implying in dicta that Milkovich applies equally to media and nonmedia defendants). Like those two circuits, we believe that the First Amendment protects nonmedia speech on matters of public concern that does not contain provably false factual assertions. Any effort to justify a media/nonmedia distinction rests on unstable ground, given the difficulty of defining with precision who belongs to the "media.” And, more importantly, the Supreme Court has concluded that the "inherent worth of speech ... does not depend upon the identity of its source, whether corporation, association, union, or individual.” First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, for our purposes, the status of the Defendants as media or nonmedia is immaterial.

. In our Kirby decision, we assessed whether the words at issue involved a matter of public concern in the context of a public employment retaliation action. See 388 F.3d at 444. Both the Supreme Court and the courts of appeals have borrowed from that context for purposes of analyzing tort liability under the First Amendment. See, e.g., Dun & Bradstreet, 472 U.S. at 759, 105 S.Ct. 2939; Levinsky’s, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 132 (1st Cir. 1997).

. The CACI opinion also concluded that other statements made by the radio host were protected by the First Amendment because they were not made with "actual malice,” as defined in the New York Times decision, i.e., those statements had not been made with knowing falsity or reckless disregard for the truth. See CACI, 536 F.3d at 294-300.

. The Post-Trial Opinion confirms that the jury assessed legal issues that were reserved to the court. See Snyder, 533 F.Supp.2d at 578 ("While signs expressing general points of view are afforded First Amendment protection, [certain] additional signs, which could be interpreted as being directed at the Snyder family, created issues for the finder of fact.”). Thus, the district court permitted the jury to determine the nature of the speech (i.e., as *222 containing assertions of actual fact specifically directed at and concerning the Snyders), and indicated that the jury should decide whether the signs should be afforded First Amendment protection.

. The district court failed to distinguish between Snyder and his deceased son for purposes of the "public figure” analysis. See Snyder, 533 F.Supp.2d at 577. Because the speech at issue cannot reasonably be interpreted as stating actual facts about any individual, we need not decide whether the court should have drawn a distinction.

. The district court did not specifically discuss four of these signs ("Don’t Pray for the USA,” "Thank God for IEDs,” "Priests Rape Boys,” and "God Hates Fags”) in its Post-Trial Opinion. It also did not mention other signs displayed at the funeral — those reading “Maryland Taliban,” "Fags Doom Nations,” and "Not Blessed Just Cursed” — that further support our conclusion that the signs contained generally directed rhetorical hyperbole, and not actual, provable facts about Snyder or his son.

. Historically, the pronoun “you” was used only in the plural form; the word “thou” was used to refer to a single person. See Webster’s Third New International Dictionary 2380-81 (1976).

. The district court recognized the nonfactual basis of the Epic when it dismissed Snyder's defamation claim. In so ruling, the court observed that the statements found therein were "essentially [the Defendants’] religious opinion and would not realistically tend to expose Snyder to public hatred or scorn.” Snyder, 533 F.Supp.2d at 572-73.