(Slip Opinion)                OCTOBER  TERM,  2010                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SNYDER *v.* PHELPS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 09–751.   Argued October 6, 2010—Decided March 2, 2011

For the past 20 years, the congregation of the Westboro Baptist Church has picketed military funerals to communicate its belief that God hates the United States for its tolerance of homosexuality, particularly in America's military.  The church's picketing has also condemned the Catholic Church for scandals involving its clergy.  Fred Phelps, who founded the church, and six Westboro Baptist parishioners (all relatives of Phelps) traveled to Maryland to picket the funeral of Marine Lance Corporal Matthew Snyder, who was killed in Iraq in the line of duty.  The picketing took place on public land approximately 1,000 feet from the church where the funeral was held, in accordance with guidance from local law enforcement officers.  The picketers peacefully displayed their signs—stating, *e.g.,* "Thank God for Dead Soldiers," "Fags Doom Nations," "America is Doomed," "Priests Rape Boys," and "You're Going to Hell"—for about 30 minutes before the funeral began.  Matthew Snyder's father (Snyder), petitioner here, saw the tops of the picketers' signs when driving to the funeral, but did not learn what was written on the signs until watching a news broadcast later that night.

Snyder filed a diversity action against Phelps, his daughters—who participated in the picketing—and the church (collectively Westboro) alleging, as relevant here, state tort claims of intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy.  A jury held Westboro liable for millions of dollars in compensatory and punitive damages.  Westboro challenged the verdict as grossly excessive and sought judgment as a matter of law on the ground that the First Amendment fully protected its speech.  The District Court reduced the punitive damages award, but left the verdict otherwise intact.  The Fourth Circuit reversed, concluding that Westboro's state-

ments were entitled to First Amendment protection because those statements were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric.

*Held:* The First Amendment shields Westboro from tort liability for its picketing in this case. Pp. 5–15.

(a) The Free Speech Clause of the First Amendment can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress. *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 50-51. Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. "[S]peech on public issues occupies the '"highest rung of the hierarchy of First Amendment values"' and is entitled to special protection." *Connick* v. *Myers*, 461 U. S. 138, 145. Although the boundaries of what constitutes speech on matters of public concern are not well defined, this Court has said that speech is of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *id.,* at 146, or when it "is a subject of general interest and of value and concern to the public," *San Diego* v. *Roe*, 543 U. S. 77, 83–84. A statement's arguably "inappropriate or controversial character . . . is irrelevant to the question whether it deals with a matter of public concern." *Rankin* v. *McPherson*, 483 U. S. 378, 387. Pp. 5–7.

To determine whether speech is of public or private concern, this Court must independently examine the "'content, form, and context,'" of the speech "'as revealed by the whole record.'" *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.,* 472 U. S. 749, 761. In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all aspects of the speech. Pp. 7–8.

The "content" of Westboro's signs plainly relates to public, rather than private, matters. The placards highlighted issues of public import—the political and moral conduct of the United States and its citizens, the fate of the Nation, homosexuality in the military, and scandals involving the Catholic clergy—and Westboro conveyed its views on those issues in a manner designed to reach as broad a public audience as possible. Even if a few of the signs were viewed as containing messages related to a particular individual, that would not change the fact that the dominant theme of Westboro's demonstration spoke to broader public issues. P. 8.

The "context" of the speech—its connection with Matthew Snyder's funeral—cannot by itself transform the nature of Westboro's speech. The signs reflected Westboro's condemnation of much in modern society, and it cannot be argued that Westboro's use of speech on public issues was in any way contrived to insulate a personal attack on

Syllabus

Snyder from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of Matthew Snyder, and there can be no serious claim that the picketing did not represent Westboro's honestly held beliefs on public issues. Westboro may have chosen the picket location to increase publicity for its views, and its speech may have been particularly hurtful to Snyder. That does not mean that its speech should be afforded less than full First Amendment protection under the circumstances of this case. Pp. 8–10.

That said, "'[e]ven protected speech is not equally permissible in all places and at all times.'" *Frisby* v. *Schultz*, 487 U. S. 474, 479. Westboro's choice of where and when to conduct its picketing is not beyond the Government's regulatory reach—it is "subject to reasonable time, place, or manner restrictions." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293. The facts here are quite different, however, both with respect to the activity being regulated and the means of restricting those activities, from the few limited situations where the Court has concluded that the location of targeted picketing can be properly regulated under provisions deemed content neutral. *Frisby*, *supra,* at 477; *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 768, distinguished. Maryland now has a law restricting funeral picketing but that law was not in effect at the time of these events, so this Court has no occasion to consider whether that law is a "reasonable time, place, or manner restrictio[n]" under the standards announced by this Court. *Clark*, *supra,* at 293. Pp. 10–12.

The "special protection" afforded to what Westboro said, in the whole context of how and where it chose to say it, cannot be overcome by a jury finding that the picketing was "outrageous" for purposes of applying the state law tort of intentional infliction of emotional distress. That would pose too great a danger that the jury would punish Westboro for its views on matters of public concern. For all these reasons, the jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress must be set aside. Pp. 12–13.

(b) Snyder also may not recover for the tort of intrusion upon seclusion. He argues that he was a member of a captive audience at his son's funeral, but the captive audience doctrine—which has been applied sparingly, see *Rowan* v. *Post Office Dept.*, 397 U. S. 728, 736–738; *Frisby*, *supra,* at 484–485—should not be expanded to the circumstances here. Westboro stayed well away from the memorial service, Snyder could see no more than the tops of the picketers' signs, and there is no indication that the picketing interfered with the funeral service itself. Pp. 13–14.

(c) Because the First Amendment bars Snyder from recovery for in-

tentional infliction of emotional distress or intrusion upon seclusion—the allegedly unlawful activity Westboro conspired to accomplish—Snyder also cannot recover for civil conspiracy based on those torts.  P. 14.

(d) Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials.  It did not disrupt Mathew Snyder's funeral, and its choice to picket at that time and place did not alter the nature of its speech.  Because this Nation has chosen to protect even hurtful speech on public issues to ensure that public debate is not stifled, Westboro must be shielded from tort liability for its picketing in this case.  Pp. 14–15.

580 F. 3d 206, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  BREYER, J., filed a concurring opinion.  ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–751

ALBERT SNYDER, PETITIONER *v.* FRED W. PHELPS, SR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 2, 2011]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A jury held members of the Westboro Baptist Church liable for millions of dollars in damages for picketing near a soldier's funeral service. The picket signs reflected the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment. The question presented is whether the First Amendment shields the church members from tort liability for their speech in this case.

I

A

Fred Phelps founded the Westboro Baptist Church in Topeka, Kansas, in 1955. The church's congregation believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military. The church frequently communicates its views by picketing, often at military funerals. In the more than 20 years that the members of Westboro Baptist have publicized their message, they have picketed nearly 600 funerals. Brief for Rutherford Institute as *Amicus Curiae* 7, n. 14.

Marine Lance Corporal Matthew Snyder was killed in Iraq in the line of duty. Lance Corporal Snyder's father selected the Catholic church in the Snyders' hometown of Westminster, Maryland, as the site for his son's funeral. Local newspapers provided notice of the time and location of the service.

Phelps became aware of Matthew Snyder's funeral and decided to travel to Maryland with six other Westboro Baptist parishioners (two of his daughters and four of his grandchildren) to picket. On the day of the memorial service, the Westboro congregation members picketed on public land adjacent to public streets near the Maryland State House, the United States Naval Academy, and Matthew Snyder's funeral. The Westboro picketers carried signs that were largely the same at all three locations. They stated, for instance: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You."

The church had notified the authorities in advance of its intent to picket at the time of the funeral, and the picketers complied with police instructions in staging their demonstration. The picketing took place within a 10- by 25-foot plot of public land adjacent to a public street, behind a temporary fence. App. to Brief for Appellants in No. 08–1026 (CA4), pp. 2282–2285 (hereinafter App.). That plot was approximately 1,000 feet from the church where the funeral was held. Several buildings separated the picket site from the church. *Id.*, at 3758. The Westboro picketers displayed their signs for about 30 minutes before the funeral began and sang hymns and recited Bible verses. None of the picketers entered church property or went to the cemetery. They did not yell or use profanity, and there was no violence associated with the picketing. *Id.*, at 2168, 2371, 2286, 2293.

The funeral procession passed within 200 to 300 feet of the picket site. Although Snyder testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event. *Id.*, at 2084–2086.[1]

B

Snyder filed suit against Phelps, Phelps's daughters, and the Westboro Baptist Church (collectively Westboro or the church) in the United States District Court for the District of Maryland under that court's diversity jurisdiction. Snyder alleged five state tort law claims: defamation, publicity given to private life, intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. Westboro moved for summary judgment contending, in part, that the church's speech was insulated from liability by the First Amendment. See 533 F. Supp. 2d 567, 570 (Md. 2008).

---

[1]A few weeks after the funeral, one of the picketers posted a message on Westboro's Web site discussing the picketing and containing religiously oriented denunciations of the Snyders, interspersed among lengthy Bible quotations. Snyder discovered the posting, referred to by the parties as the "epic," during an Internet search for his son's name. The epic is not properly before us and does not factor in our analysis. Although the epic was submitted to the jury and discussed in the courts below, Snyder never mentioned it in his petition for certiorari. See Pet. for Cert. *i* ("Snyder's claim arose out of Phelps' intentional acts *at Snyder's son's funeral*" (emphasis added)); this Court's Rule 14.1(g) (petition must contain statement "setting out the facts material to consideration of the question presented"). Nor did Snyder respond to the statement in the opposition to certiorari that "[t]hough the epic was asserted as a basis for the claims at trial, the petition . . . appears to be addressing only claims based on the picketing." Brief in Opposition 9. Snyder devoted only one paragraph in the argument section of his opening merits brief to the epic. Given the foregoing and the fact that an Internet posting may raise distinct issues in this context, we decline to consider the epic in deciding this case. See *Ontario* v. *Quon*, 560 U. S. \_\_\_, \_\_\_-\_\_\_ (2010) (slip op., at 10–12).

The District Court awarded Westboro summary judgment on Snyder's claims for defamation and publicity given to private life, concluding that Snyder could not prove the necessary elements of those torts. *Id.,* at 572–573. A trial was held on the remaining claims. At trial, Snyder described the severity of his emotional injuries. He testified that he is unable to separate the thought of his dead son from his thoughts of Westboro's picketing, and that he often becomes tearful, angry, and physically ill when he thinks about it. *Id.,* at 588–589. Expert witnesses testified that Snyder's emotional anguish had resulted in severe depression and had exacerbated pre-existing health conditions.

A jury found for Snyder on the intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy claims, and held Westboro liable for $2.9 million in compensatory damages and $8 million in punitive damages. Westboro filed several post-trial motions, including a motion contending that the jury verdict was grossly excessive and a motion seeking judgment as a matter of law on all claims on First Amendment grounds. The District Court remitted the punitive damages award to $2.1 million, but left the jury verdict otherwise intact. *Id.,* at 597.

In the Court of Appeals, Westboro's primary argument was that the church was entitled to judgment as a matter of law because the First Amendment fully protected Westboro's speech. The Court of Appeals agreed. 580 F. 3d 206, 221 (CA4 2009). The court reviewed the picket signs and concluded that Westboro's statements were entitled to First Amendment protection because those statements were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric. *Id.*, at 222–224.[2]

----

[2] One judge concurred in the judgment on the ground that Snyder had failed to introduce sufficient evidence at trial to support a jury verdict

We granted certiorari. 559 U. S. ___ (2010).

## II

To succeed on a claim for intentional infliction of emotional distress in Maryland, a plaintiff must demonstrate that the defendant intentionally or recklessly engaged in extreme and outrageous conduct that caused the plaintiff to suffer severe emotional distress. See *Harris* v. *Jones*, 281 Md. 560, 565–566, 380 A. 2d 611, 614 (1977). The Free Speech Clause of the First Amendment—"Congress shall make no law . . . abridging the freedom of speech"— can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress. See, *e.g., Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 50–51 (1988).[3]

Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. "[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 758–759 (1985) (opinion of Powell, J.) (quoting *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 776 (1978)). The First Amendment reflects "a profound national commitment to the

_____

on any of his tort claims. 580 F. 3d, at 227 (opinion of Shedd, J.). The Court of Appeals majority determined that the picketers had "voluntarily waived" any such contention on appeal. *Id.,* at 216. Like the court below, we proceed on the unexamined premise that respondents' speech was tortious.

[3] The dissent attempts to draw parallels between this case and hypothetical cases involving defamation or fighting words. *Post*, at 10–11 (opinion of ALITO, J.). But, as the court below noted, there is "no suggestion that the speech at issue falls within one of the categorical exclusions from First Amendment protection, such as those for obscenity or 'fighting words.'" 580 F. 3d, at 218, n. 12; see *United States* v. *Stevens*, 559 U. S. ___ , ___ (2010) (slip op., at 5).

principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick* v. *Myers*, 461 U. S. 138, 145 (1983) (internal quotation marks omitted).

"'[N]ot all speech is of equal First Amendment importance,'" however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. *Hustler*, *supra,* at 56 (quoting *Dun & Bradstreet*, *supra,* at 758); see *Connick*, *supra,* at 145–147. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas"; and the "threat of liability" does not pose the risk of "a reaction of self-censorship" on matters of public import. *Dun & Bradstreet*, *supra,* at 760 (internal quotation marks omitted).

We noted a short time ago, in considering whether public employee speech addressed a matter of public concern, that "the boundaries of the public concern test are not well defined." *San Diego* v. *Roe*, 543 U. S. 77, 83 (2004) (*per curiam*). Although that remains true today, we have articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors.

Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Connick*, *supra,* at 146, or when it "is a subject of legitimate news

interest; that is, a subject of general interest and of value and concern to the public," *San Diego*, *supra,* at 83–84. See *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 492–494 (1975); *Time, Inc.* v. *Hill*, 385 U. S. 374, 387– 388 (1967). The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin* v. *McPherson*, 483 U. S. 378, 387 (1987).

Our opinion in *Dun & Bradstreet*, on the other hand, provides an example of speech of only private concern. In that case we held, as a general matter, that information about a particular individual's credit report "concerns no public issue." 472 U. S., at 762. The content of the report, we explained, "was speech solely in the individual interest of the speaker and its specific business audience." *Ibid.* That was confirmed by the fact that the particular report was sent to only five subscribers to the reporting service, who were bound not to disseminate it further. *Ibid.* To cite another example, we concluded in *San Diego* v. *Roe* that, in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts did not address a public concern; the videos "did nothing to inform the public about any aspect of the [employing agency's] functioning or operation." 543 U. S., at 84.

Deciding whether speech is of public or private concern requires us to examine the "'content, form, and context'" of that speech, "'as revealed by the whole record.'" *Dun & Bradstreet*, *supra,* at 761 (quoting *Connick*, *supra,* at 147– 148). As in other First Amendment cases, the court is obligated "to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 499 (1984) (quoting *New York Times*, *supra,* at 284–286). In considering content,

form, and context, no factor is dispositive, and it is neces-
sary to evaluate all the circumstances of the speech, in-
cluding what was said, where it was said, and how it was
said.

The "content" of Westboro's signs plainly relates to
broad issues of interest to society at large, rather than
matters of "purely private concern." *Dun & Bradstreet*,
*supra,* at 759.    The placards read "God Hates the
USA/Thank God for 9/11," "America is Doomed," "Don't
Pray for the USA," "Thank God for IEDs," "Fag Troops,"
"Semper Fi Fags," "God Hates Fags," "Maryland Taliban,"
"Fags Doom Nations," "Not Blessed Just Cursed," "Thank
God for Dead Soldiers," "Pope in Hell," "Priests Rape
Boys," "You're Going to Hell," and "God Hates You."  App.
3781–3787.    While these messages may fall short of
refined social or political commentary, the issues they
highlight—the political and moral conduct of the United
States and its citizens, the fate of our Nation, homosexual-
ity in the military, and scandals involving the Catholic
clergy—are matters of public import.  The signs certainly
convey Westboro's position on those issues, in a manner
designed, unlike the private speech in *Dun & Bradstreet*,
to reach as broad a public audience as possible.  And even
if a few of the signs—such as "You're Going to Hell" and
"God Hates You"—were viewed as containing messages
related to Matthew Snyder or the Snyders specifically,
that would not change the fact that the overall thrust and
dominant theme of Westboro's demonstration spoke to
broader public issues.

Apart from the content of Westboro's signs, Snyder
contends that the "context" of the speech—its connection
with his son's funeral—makes the speech a matter of
private rather than public concern.  The fact that West-
boro spoke in connection with a funeral, however, cannot
by itself transform the nature of Westboro's speech.
Westboro's signs, displayed on public land next to a public

street, reflect the fact that the church finds much to condemn in modern society. Its speech is "fairly characterized as constituting speech on a matter of public concern," *Connick*, 461 U. S., at 146, and the funeral setting does not alter that conclusion.

Snyder argues that the church members in fact mounted a personal attack on Snyder and his family, and then attempted to "immunize their conduct by claiming that they were actually protesting the United States' tolerance of homosexuality or the supposed evils of the Catholic Church." Reply Brief for Petitioner 10. We are not concerned in this case that Westboro's speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of Matthew Snyder, and there can be no serious claim that Westboro's picketing did not represent its "honestly believed" views on public issues. *Garrison*, 379 U. S., at 73. There was no preexisting relationship or conflict between Westboro and Snyder that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter. Contrast *Connick*, *supra,* at 153 (finding public employee speech a matter of private concern when it was "no coincidence that [the speech] followed upon the heels of [a] transfer notice" affecting the employee).

Snyder goes on to argue that Westboro's speech should be afforded less than full First Amendment protection "not only because of the words" but also because the church members exploited the funeral "as a platform to bring their message to a broader audience." Brief for Petitioner 44, 40. There is no doubt that Westboro chose to stage its picketing at the Naval Academy, the Maryland State House, and Matthew Snyder's funeral to increase publicity for its views and because of the relation between those sites and its views—in the case of the military funeral,

because Westboro believes that God is killing American soldiers as punishment for the Nation's sinful policies.

Westboro's choice to convey its views in conjunction with Matthew Snyder's funeral made the expression of those views particularly hurtful to many, especially to Matthew's father. The record makes clear that the applicable legal term—"emotional distress"—fails to capture fully the anguish Westboro's choice added to Mr. Snyder's already incalculable grief. But Westboro conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street. Such space occupies a "special position in terms of First Amendment protection." *United States* v. *Grace*, 461 U. S. 171, 180 (1983). "[W]e have repeatedly referred to public streets as the archetype of a traditional public forum," noting that "'[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate." *Frisby* v. *Schultz*, 487 U. S. 474, 480 (1988).[4]

That said, "[e]ven protected speech is not equally permissible in all places and at all times." *Id.,* at 479 (quoting *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 799 (1985)). Westboro's choice of where and when to conduct its picketing is not beyond the Government's regulatory reach—it is "subject to reasonable time, place, or manner restrictions" that are consistent with the standards announced in this Court's precedents. *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984). Maryland now has a law imposing restrictions on funeral picketing, Md. Crim. Law Code Ann. §10–205

_____

[4] The dissent is wrong to suggest that the Court considers a public street "a free-fire zone in which otherwise actionable verbal attacks are shielded from liability." *Post*, at 10–11. The fact that Westboro conducted its picketing adjacent to a public street does not insulate the speech from liability, but instead heightens concerns that what is at issue is an effort to communicate to the public the church's views on matters of public concern. That is why our precedents so clearly recognize the special significance of this traditional public forum.

(Lexis Supp. 2010), as do 43 other States and the Federal Government. See Brief for American Legion as *Amicus Curiae* 18–19, n. 2 (listing statutes). To the extent these laws are content neutral, they raise very different questions from the tort verdict at issue in this case. Maryland's law, however, was not in effect at the time of the events at issue here, so we have no occasion to consider how it might apply to facts such as those before us, or whether it or other similar regulations are constitutional.[5]

We have identified a few limited situations where the location of targeted picketing can be regulated under provisions that the Court has determined to be content neutral. In *Frisby*, for example, we upheld a ban on such picketing "before or about" a particular residence, 487 U. S., at 477. In *Madsen* v. *Women's Health Center, Inc.*, we approved an injunction requiring a buffer zone between protesters and an abortion clinic entrance. 512 U. S. 753, 768 (1994). The facts here are obviously quite different, both with respect to the activity being regulated and the means of restricting those activities.

Simply put, the church members had the right to be where they were. Westboro alerted local authorities to its funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some 1,000 feet from the church, out of the sight of those at the church. The protest was not unruly; there was no shouting, profanity, or violence.

The record confirms that any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very spot where Westboro stood, holding signs that

———————
[5] The Maryland law prohibits picketing within 100 feet of a funeral service or funeral procession; Westboro's picketing would have complied with that restriction.

said "God Bless America" and "God Loves You," would not have been subjected to liability. It was what Westboro said that exposed it to tort damages.

Given that Westboro's speech was at a public place on a matter of public concern, that speech is entitled to "special protection" under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989). Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 574 (1995).

The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro's picketing was "outrageous." "Outrageousness," however, is a highly malleable standard with "an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Hustler*, 485 U. S., at 55 (internal quotation marks omitted). In a case such as this, a jury is "unlikely to be neutral with respect to the content of [the] speech," posing "a real danger of becoming an instrument for the suppression of . . . 'vehement, caustic, and sometimes unpleasan[t]'" expression. *Bose Corp.*, 466 U. S., at 510 (quoting *New York Times*, 376 U. S., at 270). Such a risk is unacceptable; "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Boos* v. *Barry*, 485 U. S. 312, 322 (1988) (some internal quotation marks omitted). What Westboro said, in the whole context of how and where it

chose to say it, is entitled to "special protection" under the First Amendment, and that protection cannot be overcome by a jury finding that the picketing was outrageous.

For all these reasons, the jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress must be set aside.

## III

The jury also found Westboro liable for the state law torts of intrusion upon seclusion and civil conspiracy. The Court of Appeals did not examine these torts independently of the intentional infliction of emotional distress tort. Instead, the Court of Appeals reversed the District Court wholesale, holding that the judgment wrongly "attache[d] tort liability to constitutionally protected speech." 580 F. 3d, at 226.

Snyder argues that even assuming Westboro's speech is entitled to First Amendment protection generally, the church is not immunized from liability for intrusion upon seclusion because Snyder was a member of a captive audience at his son's funeral. Brief for Petitioner 45–46. We do not agree. In most circumstances, "the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210–211 (1975) (internal quotation marks omitted). As a result, "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen* v. *California*, 403 U. S. 15, 21 (1971).

As a general matter, we have applied the captive audi-

ence doctrine only sparingly to protect unwilling listeners
from protected speech. For example, we have upheld a
statute allowing a homeowner to restrict the delivery of
offensive mail to his home, see *Rowan* v. *Post Office Dept.*,
397 U. S. 728, 736–738 (1970), and an ordinance prohibit-
ing picketing "before or about" any individual's residence,
*Frisby*, 487 U. S., at 484–485.

Here, Westboro stayed well away from the memorial
service. Snyder could see no more than the tops of the
signs when driving to the funeral. And there is no indica-
tion that the picketing in any way interfered with the
funeral service itself. We decline to expand the captive
audience doctrine to the circumstances presented here.

Because we find that the First Amendment bars Snyder
from recovery for intentional infliction of emotional dis-
tress or intrusion upon seclusion—the alleged unlawful
activity Westboro conspired to accomplish—we must
likewise hold that Snyder cannot recover for civil conspir-
acy based on those torts.

## IV

Our holding today is narrow. We are required in First
Amendment cases to carefully review the record, and the
reach of our opinion here is limited by the particular facts
before us. As we have noted, "the sensitivity and signifi-
cance of the interests presented in clashes between First
Amendment and [state law] rights counsel relying on
limited principles that sweep no more broadly than the
appropriate context of the instant case." *Florida Star* v.
*B. J. F.*, 491 U. S. 524, 533 (1989).

Westboro believes that America is morally flawed; many
Americans might feel the same about Westboro. West-
boro's funeral picketing is certainly hurtful and its con-
tribution to public discourse may be negligible. But
Westboro addressed matters of public import on public
property, in a peaceful manner, in full compliance with the

guidance of local officials. The speech was indeed planned to coincide with Matthew Snyder's funeral, but did not itself disrupt that funeral, and Westboro's choice to conduct its picketing at that time and place did not alter the nature of its speech.

Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here— inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.

The judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–751

_____

## ALBERT SNYDER, PETITIONER *v.* FRED W. PHELPS, SR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 2, 2011]

JUSTICE BREYER, concurring.

I agree with the Court and join its opinion. That opinion restricts its analysis here to the matter raised in the petition for certiorari, namely, Westboro's picketing activity. The opinion does not examine in depth the effect of television broadcasting. Nor does it say anything about Internet postings. The Court holds that the First Amendment protects the picketing that occurred here, primarily because the picketing addressed matters of "public concern."

While I agree with the Court's conclusion that the picketing addressed matters of public concern, I do not believe that our First Amendment analysis can stop at that point. A State can sometimes regulate picketing, even picketing on matters of public concern. See *Frisby* v. *Schultz*, 487 U. S. 474 (1988). Moreover, suppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means. And in some circumstances the use of certain words as means would be similarly unprotected. See *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942) ("fighting words").

The dissent recognizes that the means used here consist

of speech.  But it points out that the speech, like an as-
sault, seriously harmed a private individual.  Indeed, the
state tort of "intentional infliction of emotional distress"
forbids only conduct that produces distress "so severe that
no reasonable man could be expected to endure it," and
which itself is "so outrageous in character, and so extreme
in degree, as to go beyond all possible bounds of decency,
and to be regarded as atrocious, and utterly intolerable in
a civilized community."  *Post*, at 2–3 (opinion of ALITO, J.)
(quoting *Harris* v. *Jones*, 281 Md. 560, 567, 571, 380 A. 2d
611, 614, 616 (1977); internal quotation marks omitted).
The dissent requires us to ask whether our holding unrea-
sonably limits liability for intentional infliction of emo-
tional distress—to the point where A (in order to draw
attention to his views on a public matter) might launch a
verbal assault upon B, a private person, publicly revealing
the most intimate details of B's private life, while knowing
that the revelation will cause B severe emotional harm.
Does our decision leave the State powerless to protect the
individual against invasions of, *e.g.*, personal privacy, even
in the most horrendous of such circumstances?

As I understand the Court's opinion, it does not hold or
imply that the State is always powerless to provide private
individuals with necessary protection.  Rather, the Court
has reviewed the underlying facts in detail, as will some-
times prove necessary where First Amendment values and
state-protected (say, privacy-related) interests seriously
conflict.  Cf. *Florida Star* v. *B. J. F.*, 491 U. S. 524, 533
(1989); *Bose Corp.* v. *Consumers Union of United States,
Inc.*, 466 U. S. 485, 499 (1984).  That review makes clear
that Westboro's means of communicating its views con-
sisted of picketing in a place where picketing was lawful
and in compliance with all police directions.  The picketing
could not be seen or heard from the funeral ceremony
itself.  And Snyder testified that he saw no more than the
tops of the picketers' signs as he drove to the funeral.  To

uphold the application of state law in these circumstances would punish Westboro for seeking to communicate its views on matters of public concern without proportionately advancing the State's interest in protecting its citizens against severe emotional harm. Consequently, the First Amendment protects Westboro. As I read the Court's opinion, it holds no more.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–751

———————

## ALBERT SNYDER, PETITIONER *v.* FRED W. PHELPS, SR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 2, 2011]

JUSTICE ALITO, dissenting.

Our profound national commitment to free and open debate is not a license for the vicious verbal assault that occurred in this case.

Petitioner Albert Snyder is not a public figure. He is simply a parent whose son, Marine Lance Corporal Matthew Snyder, was killed in Iraq. Mr. Snyder wanted what is surely the right of any parent who experiences such an incalculable loss: to bury his son in peace. But respondents, members of the Westboro Baptist Church, deprived him of that elementary right. They first issued a press release and thus turned Matthew's funeral into a tumultuous media event. They then appeared at the church, approached as closely as they could without trespassing, and launched a malevolent verbal attack on Matthew and his family at a time of acute emotional vulnerability. As a result, Albert Snyder suffered severe and lasting emotional injury.[1]  The Court now holds that the First Amendment protected respondents' right to brutalize Mr. Snyder. I cannot agree.

## I

Respondents and other members of their church have

———————

[1] See 580 F. 3d 206, 213–214, 216 (CA4 2009).

strong opinions on certain moral, religious, and political issues, and the First Amendment ensures that they have almost limitless opportunities to express their views. They may write and distribute books, articles, and other texts; they may create and disseminate video and audio recordings; they may circulate petitions; they may speak to individuals and groups in public forums and in any private venue that wishes to accommodate them; they may picket peacefully in countless locations; they may appear on television and speak on the radio; they may post messages on the Internet and send out e-mails. And they may express their views in terms that are "uninhibited," "vehement," and "caustic." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964).

It does not follow, however, that they may intentionally inflict severe emotional injury on private persons at a time of intense emotional sensitivity by launching vicious verbal attacks that make no contribution to public debate. To protect against such injury, "most if not all jurisdictions" permit recovery in tort for the intentional infliction of emotional distress (or IIED). *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 53 (1988).

This is a very narrow tort with requirements that "are rigorous, and difficult to satisfy." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §12, p. 61 (5th ed. 1984). To recover, a plaintiff must show that the conduct at issue caused harm that was truly severe. See *Figueiredo-Torres* v. *Nickel*, 321 Md. 642, 653, 584 A. 2d 69, 75 (1991) ("[R]ecovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves" (internal quotation marks omitted)); *Harris* v. *Jones*, 281 Md. 560, 571, 380 A. 2d 611, 616 (1977) (the distress must be "'so severe that no reasonable man could be expected to endure it'" (quoting Restatement (Second) of Torts §46, Comment *j* (1963–1964))).

A plaintiff must also establish that the defendant's conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.*, at 567, 380 A. 2d, at 614 (quoting Restatement (Second) of Torts §46, Comment *d*).

Although the elements of the IIED tort are difficult to meet, respondents long ago abandoned any effort to show that those tough standards were not satisfied here. On appeal, they chose not to contest the sufficiency of the evidence. See 580 F. 3d 206, 216 (CA4 2009). They did not dispute that Mr. Snyder suffered "'wounds that are truly severe and incapable of healing themselves.'" *Figueiredo-Torres*, *supra*, at 653, 584 A. 2d, at 75. Nor did they dispute that their speech was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Harris*, *supra*, at 567, 380 A. 2d, at 614. Instead, they maintained that the First Amendment gave them a license to engage in such conduct. They are wrong.

## II

It is well established that a claim for the intentional infliction of emotional distress can be satisfied by speech. Indeed, what has been described as "[t]he leading case" recognizing this tort involved speech. Prosser and Keeton, *supra,* §12, at 60 (citing *Wilkinson* v. *Downton*, [1897] 2 Q. B. 57); see also Restatement (Second) of Torts §46, illustration 1. And although this Court has not decided the question, I think it is clear that the First Amendment does not entirely preclude liability for the intentional infliction of emotional distress by means of speech.

This Court has recognized that words may "by their very utterance inflict injury" and that the First Amendment does not shield utterances that form "no essential part of

any exposition of ideas, and are of such slight social value
as a step to truth that any benefit that may be derived
from them is clearly outweighed by the social interest in
order and morality." *Chaplinsky* v. *New Hampshire*, 315
U. S. 568, 572 (1942); see also *Cantwell* v. *Connecticut*, 310
U. S. 296, 310 (1940) ("[P]ersonal abuse is not in any
proper sense communication of information or opinion
safeguarded by the Constitution"). When grave injury is
intentionally inflicted by means of an attack like the one
at issue here, the First Amendment should not interfere
with recovery.

## III

In this case, respondents brutally attacked Matthew
Snyder, and this attack, which was almost certain to
inflict injury, was central to respondents' well-practiced
strategy for attracting public attention.

On the morning of Matthew Snyder's funeral, respon-
dents could have chosen to stage their protest at countless
locations. They could have picketed the United States
Capitol, the White House, the Supreme Court, the Penta-
gon, or any of the more than 5,600 military recruiting
stations in this country. They could have returned to the
Maryland State House or the United States Naval Acad-
emy, where they had been the day before. They could
have selected any public road where pedestrians are al-
lowed. (There are more than 4,000,000 miles of public
roads in the United States.[2]) They could have staged their
protest in a public park. (There are more than 20,000
public parks in this country.[3]) They could have chosen any

---

[2] See Dept. of Transp., Federal Highway Administration, Highway Sta-
tistics 2008, Table HM–12M, http://www.fhwa.dot.gov/policyinformation/
statistics/2008/hm12m.cfm (all Internet materials as visited Feb. 25, 2011,
and available in Clerk of Court's case file).

[3] See Trust for Public Land, 2010 City Park Facts, http://
www.tpl.org/content_documents/CityParkFacts_2010.pdf.

Catholic church where no funeral was taking place. (There are nearly 19,000 Catholic churches in the United States.[4]) But of course, a small group picketing at any of these locations would have probably gone unnoticed.

The Westboro Baptist Church, however, has devised a strategy that remedies this problem. As the Court notes, church members have protested at nearly 600 military funerals. *Ante*, at 1. They have also picketed the funerals of police officers,[5] firefighters,[6] and the victims of natural disasters,[7] accidents,[8] and shocking crimes.[9] And in advance of these protests, they issue press releases to ensure that their protests will attract public attention.[10]

This strategy works because it is expected that respondents' verbal assaults will wound the family and friends of the deceased and because the media is irresistibly drawn to the sight of persons who are visibly in grief. The more outrageous the funeral protest, the more publicity the Westboro Baptist Church is able to obtain. Thus, when the church recently announced its intention to picket the funeral of a 9-year-old girl killed in the shooting spree in Tucson—proclaiming that she was "better off dead"[11]— their announcement was national news,[12] and the church

_____

[4] See United States Conference of Catholic Bishops, Catholic Information Project, http://www.usccb.org/comm/cip.shtml#toc4.

[5] See http://www.godhatesfags.com/fliers/20110124_St-Petersburg-FL-Dead-Police.pdf.

[6] See http://www.godhatesfags.com/fliers/20110120_Dead-Volunteer-Firefighter-Connecting_the_Dots-Baltimore-MD.pdf.

[7] See http://www.godhatesfags.com/fliers/20110104_Newburg-and-Rolla-MO-Tornado-Connecting-the-Dots.pdf.

[8] See http://www.godhatesfags.com/fliers/20101218_Wichita-KS-Two-Dead-Wichita-Bikers.pdf.

[9] See http://www.godhatesfags.com/fliers/20110129_Tampa-FL-God-Sent-Military-Mom-Shooter-to-Kill-Kids.pdf.

[10] See nn. 5–9, *supra.*

[11] See http://www.godhatesfags.com/fliers/20110109_AZ-Shooter-Connecting-the-Dots-Day-2.pdf.

[12] See, *e.g.,* Stanglin, Anti-Gay Church Group Plans to Picket Tucson

was able to obtain free air time on the radio in exchange
for canceling its protest.[13]  Similarly, in 2006, the church
got air time on a talk radio show in exchange for canceling
its threatened protest at the funeral of five Amish girls
killed by a crazed gunman.[14]

In this case, respondents implemented the Westboro
Baptist Church's publicity-seeking strategy.  Their press
release stated that they were going "to picket the funeral
of Lance Cpl. Matthew A. Snyder" because "God Almighty
killed Lance Cpl. Snyder.  He died in shame, not honor—
for a fag nation cursed by God . . . .  Now in Hell—sine
die."  Supp. App. in No. 08–1026 (CA4), p. 158a.  This
announcement guaranteed that Matthew's funeral would
be transformed into a raucous media event and began the
wounding process.  It is well known that anticipation may
heighten the effect of a painful event.

On the day of the funeral, respondents, true to their
word, displayed placards that conveyed the message prom-
ised in their press release.  Signs stating "God Hates You"

—————

Funerals, USA Today, Jan. 10, 2011, http://content.usatoday.com/communities/
ondeadline/post/2011/01/anti-gay-church-group-plans-to-picket-tucston-
funerals/1; Mohanani, Group to Picket 9-Year-Old Tucson Victim's
Funeral, Palm Beach Post, Jan. 11, 2011, http://www.palmbeachpost.com/
news/nation/group-to-picket-9-year-old-tucson-victims-1177921.html; Mehta
& Santa Cruz, Tucson Rallies to Protect Girl's Family from Protesters,
Los Angeles Times, Jan. 11, 2011, http://articles.latimes.com/
2011/jan/11/nation/la-na-funeral-protest-20110112; Medrano, Funeral
Protest: Arizona Rallies to Foil Westboro Baptist Church, Christian
Science Monitor, Jan. 11, 2011, http://www.csmonitor.com/USA/2011/
0111/Funeral-protest-Arizona-rallies-to-foil-Westboro-Baptist-Church.

[13] See Santa Cruz & Mehta, Westboro Church Agrees Not to Take
Protest to Shooting Victims' Funerals, Los Angeles Times, Jan.
13, 2011, http://articles.latimes.com/2011/jan/13/nation/la-na-funeral-
protest-20110113; http://www.godhatesfags.com/fliers/20110112_AZ-
Shooter-Mike-Gallagher-Radio-Exchange.pdf.

[14] See Steinberg, Air Time Instead of Funeral Protest, N. Y. Times,
Oct. 6, 2006, p. A14.

and "Thank God for Dead Soldiers" reiterated the message
that God had caused Matthew's death in retribution for
his sins.  App. to Brief for Appellants in No. 08–1026
(CA4), pp. 3787, 3788 (hereinafter App.).  Others, stating
"You're Going to Hell" and "Not Blessed Just Cursed,"
conveyed the message that Matthew was "in Hell—sine
die." *Id.,* at 3783.

Even if those who attended the funeral were not alerted
in advance about respondents' intentions, the meaning of
these signs would not have been missed.  Since respon-
dents chose to stage their protest at Matthew Snyder's
funeral and not at any of the other countless available
venues, a reasonable person would have assumed that
there was a connection between the messages on the
placards and the deceased.  Moreover, since a church
funeral is an event that naturally brings to mind thoughts
about the afterlife, some of respondents' signs—*e.g.*, "God
Hates You," "Not Blessed Just Cursed," and "You're Going
to Hell"—would have likely been interpreted as referring
to God's judgment of the deceased.

Other signs would most naturally have been understood
as suggesting—falsely—that Matthew was gay.  Homo-
sexuality was the theme of many of the signs.  There were
signs reading "God Hates Fags," "Semper Fi Fags," "Fags
Doom Nations," and "Fag Troops."  *Id.*, at 3781–3787.
Another placard depicted two men engaging in anal inter-
course.  A reasonable bystander seeing those signs would
have likely concluded that they were meant to suggest
that the deceased was a homosexual.

After the funeral, the Westboro picketers reaffirmed the
meaning of their protest.  They posted an online account
entitled "The Burden of Marine Lance Cpl. Matthew A.
Snyder.  The Visit of Westboro Baptist Church to Help the
Inhabitants of Maryland Connect the Dots!"  *Id.,* at 3788.[15]

————————
[15] The Court refuses to consider the epic because it was not discussed

Belying any suggestion that they had simply made general comments about homosexuality, the Catholic Church, and the United States military, the "epic" addressed the Snyder family directly:

"God blessed you, Mr. and Mrs. Snyder, with a resource and his name was Matthew.  He was an arrow in your quiver!  In thanks to God for the comfort the child could bring you, you had a DUTY to prepare that child to serve the LORD his GOD—PERIOD!  You did JUST THE OPPOSITE—you raised him for the devil.

.          .          .          .          .

"Albert and Julie RIPPED that body apart and taught Matthew to defy his Creator, to divorce, and to commit adultery.  They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity.  Every dime they gave the Roman Catholic monster they condemned their own souls.  They also, in supporting satanic Catholicism, taught Matthew to be an idolater.

.          .          .          .          .

"Then after all that they sent him to fight for the United States of Sodom, a filthy country that is in lock step with his evil, wicked, and sinful manner of life, putting him in the cross hairs of a God that is so mad

—————————

in Snyder's petition for certiorari.  *Ante*, at 3, n. 1.  The epic, however, is not a distinct claim but a piece of evidence that the jury considered in imposing liability for the claims now before this Court.  The protest and the epic are parts of a single course of conduct that the jury found to constitute intentional infliction of emotional distress.  See 580 F. 3d, at 225 ("[T]he Epic cannot be divorced from the general context of the funeral protest").  The Court's strange insistence that the epic "is not properly before us," *ante*, at 3, n. 1, means that the Court has not actually made "an independent examination of the whole record," *ante*, at 7 (internal quotation marks omitted).  And the Court's refusal to consider the epic contrasts sharply with its willingness to take notice of Westboro's protest activities at other times and locations.  See *ante*, at 9.

He has smoke coming from his nostrils and fire from his mouth! How dumb was that?" *Id.,* at 3791.

In light of this evidence, it is abundantly clear that respondents, going far beyond commentary on matters of public concern, specifically attacked Matthew Snyder because (1) he was a Catholic and (2) he was a member of the United States military. Both Matthew and petitioner were private figures,[16] and this attack was not speech on a matter of public concern. While commentary on the Catholic Church or the United States military constitutes speech on matters of public concern, speech regarding Matthew Snyder's purely private conduct does not.

JUSTICE BREYER provides an apt analogy to a case in which the First Amendment would permit recovery in tort for a verbal attack:

> "[S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means. And in some circumstances the use of certain words as means would be similarly unprotected." *Ante*, at 1 (concurring opinion).

This captures what respondents did in this case. Indeed, this is the strategy that they have routinely employed—and that they will now continue to employ—inflicting severe and lasting emotional injury on an ever growing list of innocent victims.

## IV

The Court concludes that respondents' speech was protected by the First Amendment for essentially three

―――――――

[16] See 533 F. Supp. 2d 567, 577 (Md. 2008).

reasons, but none is sound.

First—and most important—the Court finds that "the overall thrust and dominant theme of [their] demonstration spoke to" broad public issues. *Ante,* at 8. As I have attempted to show, this portrayal is quite inaccurate; respondents' attack on Matthew was of central importance. But in any event, I fail to see why actionable speech should be immunized simply because it is interspersed with speech that is protected. The First Amendment allows recovery for defamatory statements that are interspersed with nondefamatory statements on matters of public concern, and there is no good reason why respondents' attack on Matthew Snyder and his family should be treated differently.

Second, the Court suggests that respondents' personal attack on Matthew Snyder is entitled to First Amendment protection because it was not motivated by a private grudge, see *ante*, at 9, but I see no basis for the strange distinction that the Court appears to draw. Respondents' motivation—"to increase publicity for its views," *ibid.*—did not transform their statements attacking the character of a private figure into statements that made a contribution to debate on matters of public concern. Nor did their publicity-seeking motivation soften the sting of their attack. And as far as culpability is concerned, one might well think that wounding statements uttered in the heat of a private feud are less, not more, blameworthy than similar statements made as part of a cold and calculated strategy to slash a stranger as a means of attracting public attention.

Third, the Court finds it significant that respondents' protest occurred on a public street, but this fact alone should not be enough to preclude IIED liability. To be sure, statements made on a public street may be less likely to satisfy the elements of the IIED tort than statements made on private property, but there is no reason

why a public street in close proximity to the scene of a funeral should be regarded as a free-fire zone in which otherwise actionable verbal attacks are shielded from liability. If the First Amendment permits the States to protect their residents from the harm inflicted by such attacks—and the Court does not hold otherwise—then the location of the tort should not be dispositive. A physical assault may occur without trespassing; it is no defense that the perpetrator had "the right to be where [he was]." See *ante*, at 11. And the same should be true with respect to unprotected speech. Neither classic "fighting words" nor defamatory statements are immunized when they occur in a public place, and there is no good reason to treat a verbal assault based on the conduct or character of a private figure like Matthew Snyder any differently.

One final comment about the opinion of the Court is in order. The Court suggests that the wounds inflicted by vicious verbal assaults at funerals will be prevented or at least mitigated in the future by new laws that restrict picketing within a specified distance of a funeral. See *ante*, at 10–11. It is apparent, however, that the enactment of these laws is no substitute for the protection provided by the established IIED tort; according to the Court, the verbal attacks that severely wounded petitioner in this case complied with the new Maryland law regulating funeral picketing. See *ante*, at 11, n. 5. And there is absolutely nothing to suggest that Congress and the state legislatures, in enacting these laws, intended them to displace the protection provided by the well-established IIED tort.

The real significance of these new laws is not that they obviate the need for IIED protection. Rather, their enactment dramatically illustrates the fundamental point that funerals are unique events at which special protection against emotional assaults is in order. At funerals, the emotional well-being of bereaved relatives is particularly

vulnerable. See *National Archives and Records Admin.* v. *Favish*, 541 U. S. 157, 168 (2004). Exploitation of a funeral for the purpose of attracting public attention "intrud[es] upon their . . . grief," *ibid.*, and may permanently stain their memories of the final moments before a loved one is laid to rest. Allowing family members to have a few hours of peace without harassment does not undermine public debate. I would therefore hold that, in this setting, the First Amendment permits a private figure to recover for the intentional infliction of emotional distress caused by speech on a matter of private concern.

V

In reversing the District Court judgment in favor of petitioner, the Court of Appeals relied on several grounds not discussed in the opinion of this Court or in the separate opinion supporting affirmance. I now turn briefly to those issues.

First, the Court of Appeals held that the District Court erred by allowing the jury to decide whether respondents' speech was "'directed specifically at the Snyder family.'" 580 F. 3d, at 221. It is not clear whether the Court of Appeals thought that this was a question for the trial judge alone or a question on which the judge had to make a preliminary ruling before sending it to the jury. In either event, however, the submission of this question to the jury was not reversible error because, as explained above, it is clear that respondents' statements targeted the Snyders.

Second, the Court of Appeals held that the trial judge went astray in allowing the jury to decide whether respondents' speech was so "'offensive and shocking as to not be entitled to First Amendment protection.'" *Ibid.* This instruction also did respondents no harm. Because their speech did not relate to a matter of public concern, it was not protected from liability by the First Amendment,

and the only question for the jury was whether the elements of the IIED tort were met.

Third, the Court of Appeals appears to have concluded that the First Amendment does not permit an IIED plaintiff to recover for speech that cannot reasonably be interpreted as stating actual facts about an individual. See *id.,* at 222. In reaching this conclusion, the Court of Appeals relied on two of our cases—*Milkovich* v. *Lorain Journal Co.*, 497 U. S. 1 (1990), and *Hustler,* 485 U. S. 46—but neither supports the broad proposition that the Court of Appeals adopted.

*Milkovich* was a defamation case, and falsity is an element of defamation. Nothing in *Milkovich* even hints that the First Amendment requires that this defamation element be engrafted onto the IIED tort.

*Hustler* did involve an IIED claim, but the plaintiff there was a public figure, and the Court did not suggest that its holding would also apply in a case involving a private figure. Nor did the Court suggest that its holding applied across the board to all types of IIED claims. Instead, the holding was limited to "publications such as the one here at issue," namely, a caricature in a magazine. 485 U. S., at 56. Unless a caricature of a public figure can reasonably be interpreted as stating facts that may be proved to be wrong, the caricature does not have the same potential to wound as a personal verbal assault on a vulnerable private figure.

Because I cannot agree either with the holding of this Court or the other grounds on which the Court of Appeals relied, I would reverse the decision below and remand for further proceedings.[17]

───────────

[17] The Court affirms the decision of the Fourth Circuit with respect to petitioner's claim of intrusion upon seclusion on a ground not addressed by the Fourth Circuit. I would not reach out to decide that issue but would instead leave it for the Fourth Circuit to decide on remand. I would likewise allow the Fourth Circuit on remand to decide whether

## VI

Respondents' outrageous conduct caused petitioner great injury, and the Court now compounds that injury by depriving petitioner of a judgment that acknowledges the wrong he suffered.

In order to have a society in which public issues can be openly and vigorously debated, it is not necessary to allow the brutalization of innocent victims like petitioner. I therefore respectfully dissent.

---

the judgment on the claim of civil conspiracy can survive in light of the ultimate disposition of the IIED and intrusion upon seclusion claims.